I want to confirm that with us as the third judge is Judge Ralph K. Winter, who is participating by video from his chambers in New Haven, Connecticut. Can you hear us, Judge Winter? Yes. Can you hear me? With apologies for being a few minutes late. Can you hear me? What's that? Can you hear me? Yes, I'm sure. Yes, we can, and I'm sure we will. Okay. Well, then, what is the pity? So, we are under unusual time restraints. I usually preside with loose reigns, but today we want to stick to the time allotments as much as we can. Let's hear first, Counselor, in Saada v. Golan. Go ahead, Mr. Wright. Good afternoon, Your Honors, and may it please the Court. My name is Marissa Doran, and together with my colleagues at Paul Weiss, I represent the appellant in this matter, Ms. Golan. This is a case under the Hague Convention involving a very young child at grave risk of harm because of severe domestic violence. In this appeal, Mr. Saada asks this court to do what no appellate court has ever done, affirm the holding of a district court that a child at grave risk of harm should nevertheless be returned, pursuant to a suite of promises by an abuser. What the district court did here was error for two reasons. First, U.S. courts have no jurisdiction to enforce promises once a child is overseas. Post-return promises, like Mr. Saada's here to stay away from Ms. Golan if she returns to Italy, are not protective as a matter of law. Can you tell us which, if any, of the promises that were forward-looking have been completed, with respect to charges in Italy, with respect to things like that? I understand there are still ones that you're saying cannot be enforced, but is the state of play different from what it was when you filed your briefs? Your Honor, the state of play is not different from what it was when we filed our appellate briefs. And in our view, in addition to the stay away condition, which is unenforceable, at least four other undertakings are insufficient, whatever initiatives Mr. Saada has taken with respect to those initiatives. For one, Mr. Saada promises to drop criminal prosecution or endeavor to drop criminal prosecution. He can't, and therefore a return to the status quo ante is not possible. Second, he promises to go to therapy. The therapy condition- And on the first one- Yes. My understanding was he was going to let the prosecutors in Italy know that he was not interested in pursuing the charges. Then I understand it would be their decision whether to drop them. Have they been dropped? We've received no notice that they've been dropped. Okay. The second condition would also be insufficient. He's promised to go to therapy, but the therapy condition is a third of what his own expert said would be necessary here. He might not go, and even if he does go, it's not going to work in the short term. That was the undisputed record. Third, he promises to help her get legal status, but that too is unenforceable. And fourth, he's promised to pay $30,000. There's not a shred of evidence or any testimony in the record showing that that would be sufficient, nor were we given an opportunity to show that it would not be. We don't see in this situation how there could be conditions that could render a return safe here. I thought your greater concern, though, was that he promises that he won't attempt to see the children without her approval, and that that is unenforceable once he gets to Italy. Am I wrong in understanding that that's the primary concern? I do believe that a core promise is his promise to stay away, and that is unenforceable. Now, the problem is that it's promised to a U.S. court. Is there any way these matters can be put into place before your client returns to Italy? I mean, can the parents go before an Italian court and get some kind of limitations on his visitation in Italy? Well, that's precisely the issue. The question in a Hague Convention case is what happens in the period until an Italian court can put measures into place. We're dealing with that immediate period here. There may well be a custody proceeding at some time down the line, in months, where the testimony here was that maybe it would take a year, year and a half. At some point, a court is going to set up a system that will govern the safety of this child and this family. But the question here is what happens in the period pending that determination. Moreover, I think even if the district court here tried to ask the Italian court to put into place protective measures, that itself would be a breach of comity. It's not permissible here. The second problem is that the State Department and five circuits have emphasized that in cases involving grave risk from domestic violence, it's more appropriate to deny a return than to order a return subject to extensive undertakings, however well-meaning they are. Federal courts who are sitting in Hague jurisdiction have exceptionally limited authority. They're neither equipped nor empowered to outline programs of support for families in distress. And when the district court attempted to do here, it crossed a line. Let me ask you, what is the relief that you're seeking from us? If you were writing the decreto language of an order, what would that look like? Your Honor, we think the appropriate course would be to reverse the decision in order that the petition be denied. Outright, as opposed to, for example, vacator of the order and a remand for further proceedings concerning some of the ameliorative measures that Judge Raji has adverted to which would mitigate the risk of harm. In our view, the reason that remand would not be necessary is that the judge has already made a finding that there is grave risk of harm and that notwithstanding the protections that Italy can offer, it is necessary to secure certain promises from Mr. Sata. Because those promises are unenforceable, there is no protective measure that can ensure safe return here. So in your view, we should reverse outright, which would end the proceeding altogether, regardless of any of the proposed undertakings? In our view, yes. The State Department and five circuits have said that the use of undertakings, meaning here post-return promises by an abuser, is unwise in domestic violence cases. And the district court relied upon those promises here because the district court found that those promises were necessary to ensure the child's safety. So if I understand your position in response to my question, do you believe that reversal is required as a matter of law, that there's nothing in the nature of further findings that are appropriate or necessary? Alternatively, Your Honor, a finding that Mr. Sata can be . . . All right, don't worry. We operate in the manner of the English trial courts. People are free to walk around and talk to whoever they wish to talk to. Two points, I think. One, it's not permissible for the district court to order that a mirror order be put in place by the nation of Italy. That's a comedy infringement. Second, if what we're doing here is relying upon Mr. Sata's promise to change, that's clear error. You could reverse on grounds of clear error. Any finding that he can be trusted, it would be an error to rely on undertakings that presume a capacity to change, where that's contradicted by both external evidence and intrinsic evidence. The judge has made a finding here that he hasn't demonstrated a capacity to change. The expert testimony was that he can't control his behavior. The undertakings here presume a capacity to change. There's no evidence for that capacity. But that gets to the fact that his inability to change has to do with his violence against his wife. The district court found that there was no record evidence of any violence against the children. To the extent we are bound by those fact findings, isn't the issue with respect to his changing whether he would honor conditions that limited his contact with his children and his wife to whatever would be necessary to avoid there being witnesses and exposed to the kind of violence that occurred in the past? Well, Your Honor, in considering the legitimacy of Mr. Sata's promises, it's worth weighing that neither the judge nor the expert nor Mr. Sata in his briefs below or on appeal believe that he should be allowed in the room alone with his child. The expert testimony was that the possibility is, quote, definitely there that he might hit the child. On that record, I don't see why a court would want to take the risk here. In some of our cases under the Hague Convention, we've required arrangements whereby the child would be placed in the custody of a third person. That was the case in the Blondin case, B-L-O-N-D-I-N. Is that not available, that kind of arrangement available here? My understanding, Your Honor, is that because Marie-Helene, the child in Blondin, could speak for herself, she was not returned, and because she would suffer re-traumatization upon re-entry, she was not returned, even to a third party. In our view, where there's a capable parent and where a child is nonverbal and already traumatized, it would be unconscionable and absolutely not in keeping with the purposes of the Hague Convention to return the child to foster care, which would be the situation here. There was no fact-finding on that question. Thanks very much. You've reserved some time. Yes, please. Mr. Min. Thank you, Your Honor. Your Honors, may it please the Court. The District Court found after a nine-day trial with 17 witnesses, 7 expert witnesses, that number one, the child's habitual residence was Italy, and that there were sufficient measures to ameliorate any risk to the child if the child were to be returned to Italy. Importantly, the District Court— How are they enforced? What are some of the critical conditions enforceable, specifically the one that he will not attempt to visit the children or the child except with the mother's approval and all kinds of other conditions? I mean, once they're in Italy, if he doesn't abide by that, who's going to enforce that condition? Number one, I think that the reality of the circumstances, and the Court did talk about the fact that by giving her a specific amount of money so she can go to Italy, secure an apartment, and not— That's a separate condition. That gets her there and gives her support. How are you going to enforce the condition? How is she going to enforce the condition I asked you to focus on? I think that that particular measure is almost self-enforcing because her ability, as we discussed in the District Court record, is that she can go anywhere in Italy, wherever she wants, and she has no duty to disclose her address or location to the father until such a time as the Italian courts find it appropriate. So the issue of the money that she's receiving allows her the freedom to go to Italy.  She can go anywhere in Italy to secure housing, not provide that information to the father, and be able to keep her address confidential. And I think that that ability allows and gives her some protection to know that the father can't just come and see her. He, of course, has made the promises, and the District Court has not found that they don't believe that the father will comply with those conditions, which is distinguishable from prior cases such as Davey's, where the court explicitly found that the petitioner would not comply with the undertakings that they proposed in those cases. In this case, the District Court made no finding. In fact, the District Court made a note that the father did comply during the social services investigation in Italy, that he made all his appointments and cooperated in those proceedings. So in this— He's a client in a position. He's instituted proceedings in Italy about custody. Is he in a position to ask the Italian court to enter an order on these conditions so that they would be in effect upon the mother's setting foot on Italian soil? Unfortunately, at this time, I'm not able to answer whether or not he would be able to, but— I don't think that would be critical. I mean, why is your client not in a position to come to the court and say, she doesn't think it's enforceable, we'll get an Italian order? Well, to the extent that the court remains his case for those types of questions to be answered, we certainly would explore that. I will note that the parties did appear— Nine days before Judge Donnelly, that didn't come up? Or that sort of concern didn't come up? It seems to me, perhaps to more than me, fundamental and kind of obvious. What was going on during those nine days? What kind of options were you considering? Well, the ameliorative measures that were proposed during the course of the proceedings included promises to stay away and included the prepayment of certain funds so that she could secure housing and also the condition that she could secure housing anywhere in Italy without disclosing her address to the father. We believe that that would be sufficient protection for the mother to feel safe to go back and feel like the father could not know her address and her location. I will state that the parties did, in April, appear, both represented by counsel, in Italian custody proceedings. And we noted in a footnote in our brief that those proceedings have been adjourned until September, awaiting a final decision in this case. So the parties are represented in Italy. They're in front of custody proceedings. The mother, as far as I know, has asked for an order of custody there, has asked for the ability to relocate. So these issues are all there. The mother herself can ask for an order of protection. The other thing that has been accomplished, that the court ordered as undertakings, is we sent the entire trial record to the Italian courts. They were filed by the Italian attorneys in those proceedings. So the Italian courts are fully aware of all the statements and all the fact-finding that this court made, the district court made in this case. So they're ready and they're willing and they're capable of proceeding as they see fit when they go back in September. And in the meantime, again, the mother, represented by counsel, can make any necessary applications that she wants to make. I will note, Your Honor asked earlier about the criminal charges. It's my understanding that the letter was sent to the prosecutor's office, the request was made to drop the charges, and the prosecutor has issued a request to have those charges dropped. That is the next step. Ultimately, at that point, a decision has to be made to drop those charges, but the prosecutor has filed that request, and that's something we can explore if that requirement were to be made a prerequisite to a return. That's something we could explore in the district court, and that's something that occurred, of course, after briefing had concluded. If you prevail here, would you describe briefly the timeline and exactly what would happen pursuant to the orders of the district court? Sure. The case, if the court affirms this matter, then the case would go back to the district court for the logistics of the return, setting a firm date of when the child should be returned by. It would be our hope that the return would be somewhat before the September custody case so that it would give the parties a good opportunity to get there and make any applications they deem necessary so the Italian courts can make any rulings they feel are in the best interest of the child. And that's really the ultimate purpose here of the Hague Convention is to allow the courts of the country of habitual residence to determine those issues, to protect the child. The district court here did credit the testimony of petitioners, of appellees, expert witnesses, as to the Italian legal system. Let's get to the point where she's on the plane. How does that work, assuming that you have no trouble with any of these questions? So describe the scenario that we could encounter. Sure. There is discretion for the district court in terms of the logistics of the return, but one option could be the court says the child must be returned by so-and-so date. That information can be kept confidential between the attorneys so that we're confident the child has been returned, but also kept confidential to the father so that the father does not know when the child will be returned and does not know when, where, to which airport, and that the mother can secure her own place without. So the mother and daughter would go together, and the child would go together to Italy. Yes, Your Honor. To a place not disclosed to the husband, and follow through on that. Go on. And then, again, assuming that this is somewhat before the September custody appearance, not being an Italian lawyer, but I would presume she would make an appearance before the Italian judges on the issue of custody and her applications for relocation. And at that point, the Italian courts would take over, and they would either keep her address confidential, as they can in New York State court proceedings, or whatever ruling they make. They may issue orders of protection. They may issue supervised visitation. They may allow her to relocate to the United States. These are all things that certainly I can't answer in terms of what they may do, but those are all possibilities that are available to the Italian courts. I will note, in response to something Appellant's counsel raised, this court, the district court, has wide discretion or has discretion to order a return of a child, even in light of finding affirmative defenses. The treaty itself states that even if an affirmative defense is sustained, that the court may decline to order the return of the child, not shall decline to order the return of the child. The Second Circuit is clear, and it started with Blondin, that the court is to examine all possible avenues to return the child in light of the grave risk findings. In the first appeal, the Second Circuit, this court, remanded the case to explore what Your Honor talked about before, putting the child in the placement of a third party, perhaps. In Ermini v. Vittori, again, in this court, in footnote number 10, the court said that normally, after a grave risk finding, the next question would be, are there any ameliorative measures that could be taken to allow the child to be returned, in that case, to Italy? The court, in that case, declined to do so because of the specific risk to that child in that case. The child had special needs, I believe, in that case. So those are all distinguishable from this case, but also highlight the fact that this court followed the guidelines of the Second Circuit, examined all the possible undertakings that were appropriate, and this court specifically gave priority and made it very clear that by giving the child sufficient funding for housing and expenses and agreeing to stay away, that this would reduce the risk of the child. And again, the risk to the child was witnessing the violence between the parties. It wasn't about violence towards the child. In fact, there was substantial, uncontroverted evidence that the father and the son, in this case, had a very loving, close relationship. Nobody disputed that, and we would simply ask that the court uphold the district court decision and order the return. The child is how old now? Just turned three years old, Your Honor. It's a boy, right? Yes, Your Honor. It doesn't matter. Everyone keeps using the child. Yes, Your Honor. For some obscure reason, probably based on some large principle under the Hay Convention. All right. Thank you, Your Honor. Ms. Duran. Your Honor, fundamentally, none of the promises here are self-enforcing. The Italian court won't get involved when Ms. Golan gets off the plane without her taking specific action to ensure protections. $30,000 is not going to ensure his... The Italian court won't take action without what? Without her trying to invoke the protections of Italy. It's not as though when she steps off the plane, there's a protective apparatus that immediately... Her lawyers were in court in April. There's a custody proceeding. She appeared in absentia in an ongoing custody proceeding. Her attorneys appeared. She has one attorney in a proceeding. Let me start again. Did an attorney representing her stand in the Italian court? Yes, Your Honor. Okay. Did that attorney ask the Italian court to require certain conditions be put in place before your client returned to the country? At that stage, there was no indication that Ms. Golan would be returning. Well, you have a court order that directs her to return under certain conditions. And so your concern, as I understand it, is that those conditions are not enforceable in Italy. And so I'm asking you whether she asked the Italian court to itself order those conditions so that she would have the protection of Italian law. Your Honor, I believe the timing is off. The trial happened here. Then there was an in absentia... I see. I see. Then there was an opinion. So the opportunity hasn't yet arisen. And she has not since then tried to get the Italian court to put any conditions in place? No, Your Honor. That proceeding is very complicated. In that proceeding, Mr. Sada contends that her allegations of domestic violence are slanderous, which goes to the point about the $30,000. It's going to be very expensive for her to get all those English-like language records translated. She needs to take serious efforts to make sure that this child is protected. This child has special needs. He is, in essence, a nonverbal 3-year-old. It is not practical to think that she can somehow secret away into a cave somewhere in Italy and Mr. Sada is not going to find her. She doesn't speak Italian. She's only ever lived in Milan. She has no legal residency there and no work papers. This is simply not practical. And the lesson from this case right now is that in the Eastern District of New York, you can defeat a finding of clear and convincing evidence of grave risk with a promise to pay a healthy sum of money and stay away. That should not be the law. And that's a devastating precedent for victims of domestic violence. Thank you very much. Mr. Roberts, can I clarify one mistake of fact that I just heard? You've had your chance, but take 30 seconds. It just came up. Your Honor asked about the sequence of events. In fact, the district court decision was March 22, 2019. The parties appeared in April in Italy. So I just wanted to clarify that for the record. If the other side wishes to respond. Your Honor, we can submit a correction if we're wrong about this, but we're learning some new facts today. I don't know. Let's do that. The court order I'm looking at is dated March 22, 2019. That's right. I believe I will need to clarify this, but I believe the only question, we were not present at the Italian hearing. I believe the only question was an adjournment. At that point, we were on expedited appeal to this circuit. And in our view, it's in our, I suppose, Your Honor, the answer is that in our view, the question wasn't right. This woman should not be returning to Italy, and so it wasn't right. All right. Let me give you an opportunity by 5 p.m. on Thursday, June 20th, to submit a letter commenting on anything you think appropriate, especially issues of contested fact that have arisen. And five pages, double spaced, should do it. And then opposing counsel shall have until 5 p.m. on Friday, June 21, to respond. Thank you, Your Honor. All of this, of course, can be done electronically. Thank you very much. Thanks to both sides for your arguments. Much appreciated. We'll reserve decision.